PAGE, TREASURER, v. ALEXANDER, TREASURER.

4-7284                                          177 S. W. 2d 415

Opinion delivered December 20, 1943.

*Guy E. Williams,* Attorney General, *Earl N. Williams* and *J. F. Koone,* Assistant Attorneys General, for appellant.

*Cooper Jacoway, II. M. Jacoway* and *Leffel Gentry,* for appellee.

GRIFFIN SMITH, Chief Justice.  The Arkansas Gross Receipts Act of 1941 was approved March 26 of the year enacted.  The object, as expressed by § 17, was to raise money for the purposes mentioned.[1]  All funds are payable to the Commissioner of Revenues.  Section 18 directs distribution.

Act 187, approved March 10, 1943, was passed without the emergency clause.  Its title is shown in the margin.[2]  Effect is to redistribute sales tax funds.  The Treasurer is directed to open on his books the ''Cities and Counties Fund.''[3]  Section 21 of the 1941 enactment provided that it should become effective July 1, following approval.  Changes in § 18 of Act 386 made by Act 187 are shown in the footnote.[4]

---

[1] These purposes were relief for the common schools, free textbooks, to finance state charitable institutions, to provide funds for circulating library service, and to provide for wards of the state "who will receive support through the State Welfare Commission, and for worthy causes."

[2] An Act to amend § 18 of Act 386 of the Acts of 1941 General Assembly of the State of Arkansas; to provide revenues for cities and counties creating the cities and counties fund in the office of the State Treasurer; making provisions for the distribution of money credited to the funds mentioned in said Act, declaring an emergency and for other purposes.

[3] Act 386 made distribution of sales tax funds without limitation as to the gross or net amount that might be realized from the levy. [Where the term "Treasurer" is used in this opinion, it has reference to the Treasurer of State, and "Auditor" means Auditor of State.]

[4] Act 386 dealt with "the moneys received by the Commissioner." Act 187 reads, "Of the first $8,000,000 received by the Commissioner." Act 187 substitutes the words "during each fiscal year" for "the fiscal year 1941-42," appearing in the fifth line of the older statute. Beginning on the tenth and continuing into the eleventh line of Act 386, the Commissioner is directed, "beginning with the fiscal year beginning July 1, 1941," to pay certain sums into the Homestead Tax Exemption Fund. Act 187 directs the Commissioner to make payment to the Fund, but omits the words "beginning with the fiscal year beginning July 1, 1941." Lines 20 and 21 of Act 386 direct the Commissioner to pay the Treasurer of State for credit to the Welfare Fund "twenty-five percent of the taxes collected under this Act." The 1943 amendment substitutes twenty percent. Where (line 23 of Act 386) the Commissioner is directed to pay to the Teachers' Salary Fund "one and a half percent of the taxes collected under this Act," the amendment uses the words "one and a half percent *thereof.*" Following directions in each Act that

The questions are, (a) When did Act 187 become effective? and (b) What amount of money should the Treasurer of State credit to Cities and Counties Fund? in consequence of a suit brought by G. L. Alexander, Treasurer of the City of Little Rock, and by the City of Little Rock, against Earl Page, Treasurer, and Oscar Humphrey, Auditor. A third question is, Should the fund be distributed by State authorities, or by the Clerk of the Pulaski chancery court?

Essential parts of a stipulation are that on June 10, 1943, an amount in excess of eight million dollars had been collected and accounted for by the Commissioner under Act 386, and ". . . the sum of $700,600 was collected under said Act and turned over to the State Treasurer during the last twenty-one days of June, 1943."

It was then agreed that the Treasurer had refused to credit to Cities and Counties Fund any moneys collected from June 10 to July 1, although total sales tax collections available for distribution during the 1942-1943 fiscal year were $8,937,150.44.[5]

The decree was that all revenues collected from June 10 to July 1 be distributed as Act 187 directs. Because aggregate receipts as of June 10th amounted to eight

---

the Commissioner distribute one percent to the Confederate Pension Fund, (effect of Act 386 being that one percent of *all* net collections go to this fund, while under Act 187 one percent of the first eight million would be so applied) the Treasurer, by Act 187, is directed to create the Cities and Counties Fund. [A directive in Act 386 following reference to the Confederate Pension Fund just mentioned, beginning with "Any excess from the percentage allocated the Textbook Fund and Homestead Exemption Fund," and ending with "This section shall not be construed as repealing § 15 of Act 162 of the Acts of 1937" is repeated in Act 187, but is transferred to the end of § 1. Other changes are made.]

[5] The sales tax collected by the Revenue Department and deposited in the State Treasury, under Act 386 of 1941, for the fiscal year ended June 30, 1943, was distributed to the following funds: Textbook, $360,000; Confederate Pension, $189,418.51; State Sinking, $9,977.99; Charities, $953,856.03; Vocational Education, $9,978; School Supervision, $9,120.02; Arkansas Medical School, $4,989; Welfare, $2,234,-287.62; Common School, $4,468,575.24; Teachers' Salary, $134,057.26; University of Arkansas, $117,194.66; Teachers College, $23,383.69; State College-Jonesboro, $17,464.30; Polytechnic College-Russellville, $17,464.28; A. & M. College, Third District-Magnolia, $17,464.29; A. & M. College, Fourth District-Monticello, $17,464.30; Henderson Teachers College-Arkadelphia, $23,383.73; A. M. & N. College, Pine Bluff, $5,985; School Equalizing, $323,086.52; total, $8,937,150.44.

million dollars or more, Cities and Counties Fund should not be credited with five percent of revenues collected prior to June 10, but ". . . inasmuch as on the effective date of Act 187 there had been collected under Act 386 an amount equal to or in excess of eight million dollars from July 1, 1942, . . . then under the terms of Act 187 the Cities and Counties Fund was entitled to be credited with thirty-six percent of the next $1,200,000, or as much thereof as was collected from June 10 until July 1."

Collections during the last twenty-one days of June were found to have been $700,600, thirty-six percent being $252,216.

There was a finding that the complaint was filed on behalf of cities and counties as a class; that Cooper Jacoway and Leffel Gentry were entitled to attorneys' fees "for representing all of said cities and counties," and that fees should be paid by such cities and counties from the recovery. Finally, it was directed that the Auditor, on voucher issued by the Treasurer, should send to the Clerk of the Pulaski Chancery Court a warrant for $252,216, proceeds to be disposed of in the manner set out in the margin.[6]

The Attorney General's insistence is that because, throughout Act 386 there is reference to "each fiscal year," and because, by express terms it became effective July 1, 1941, Act 187 must necessarily be construed as an integral fitted into the principle Act. Therefore, it is argued, the Act's mandate that Cities and Counties be credited with "the remaining five percent *thereof*"[7] until $400,000 has been paid into such fund "for each fiscal year or part thereof" has reference to any part

[6] The direction was: "Said amount [shall] be hereafter distributed under further order of this court to the cities and counties entitled to share in said fund, in the proportion provided in § 2 of Act 187 of the Acts of the General Assembly of Arkansas for the year 1943, after the allowance of a reasonable attorneys' fee as may be hereafter allowed by the court."

[7] "The remaining five percent thereof" has reference to the difference between ninety-five percent apportioned to various agencies (or allotted for specific purposes) and one hundred percent of sales tax collections. It arose when by Act 187 allotment to the Welfare Fund was reduced from twenty-five to twenty percent.

of an entire fiscal year during which five percent of eight million dollars amounts to $400,000.

While there is some logic in this contention—additional support for which is found in language allotting to the fund twenty-three and a half percent of "all moneys in excess of the first $9,200,000 *annually collected under this Act*"—the fact remains that the Legislature, in providing that cities and counties should receive thirty-six percent of twelve hundred thousand dollars collected in excess of eight million, inserted this directive in a sentence following the term "for each fiscal year or part thereof."

It is our view, therefore, that the Act went into effect June 10th,[8] and that cities and counties are entitled to share in distribution to the extent of thirty-six percent of all revenues in excess of eight million and not above nine million two hundred thousand dollars, provided "moneys arising from a tax levied for one purpose" are not "used for any other purpose." Art. 16, § 11, Constitution.[9] Under Act 386 cities and counties were not beneficiaries of funds arising from the sales tax. As amended in 1943 the new fund was made to share; but, since the apportionments (whether five percent if collections were less than eight million, or thirty-six percent of $1,200,000) could only be from moneys arising from a tax levied for the benefit of cities and counties, and since Act 187 was not in effect until June 10, it follows that the money must have been paid by the taxpayer during the last twenty-one days of June in order that cities and counties might participate prior to the beginning of a new fiscal year July 1, 1943.

The law is, of course, that a *levy* made for the purpose of raising funds for an expressed purpose may not be used in raising money for a different purpose. *Collins* v. *Humphrey*, 181 Ark. 609, 27 S. W. 2d 102. In that case Chief Justice HART said: "By the use of the phrase

[8] *Cone* v. *Hope-Fulton-Emmett Road Improvement District*, 169 Ark. 1032, 277 S. W. 544.

[9] The full section is: "No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same; and no moneys arising from a tax levied for one purpose shall be used for any other purpose."

'arising from a tax levied for one purpose' it was evidently intended that, when the tax was collected, it automatically belonged to the purpose for which it was levied, and could not thereafter be diverted by the Legislature to another purpose.''

The money arises, within Constitutional contemplation, when it is paid by the purchaser to the merchant or other seller. Section 5 of Act 386 makes the tax ''due and payable'' on the first day of each month; but, after August 15, 1941, reports as to the seller must be made to the Commissioner ''on or before the fifteenth day of each month for the preceding calendar month.''

It will be seen that, for all practical purposes, taxes paid to a merchant or other seller from day to day during a particular month are moneys payable on the first day of the succeeding month, although a report is not required until the 15th. The stipulation is that $700,600 was ''collected under said Act 386 and turned over to the State Treasurer during the last twenty-one days of June, 1943.'' There is no agreement that the collections represented moneys arising from the sales during the specific period of twenty-one days, but only that the excess was collected *under the Act* and turned over to the Treasurer. Obviously the collections referred to are those made by the Commissioner instead of the seller. Reports to the Commissioner made June 15th would cover seller collections for May, while July 15th reports would include all of June.

We apprehend that in remanding the cause for determination of the facts mentioned, difficulties of accountancy will be encountered. Still, records maintained by the Commissioner are such that from them relatively accurate information may be had, and it is essential to the law's certainty that this be done.

This is not a class suit in the sense that a city or county not participating in a duly authorized manner may be charged with costs and fees. It is primarily an action by the City of Little Rock, brought by its elected City Attorney, to procure for the municipality the funds alleged to be due. Refusal of the Treasurer to set up the

fund as directed by the Legislature, and declination of the Auditor to issue a warrant, justified Little Rock in proceeding, although the two State officials acted with proper circumspection in requiring judicial construction of the Act before disbursing money. But other than a general allegation in the complaint that all cities and counties are entitled to share in the recovery, there is nothing to show that a particular city or county has become committed to such an extent that it would be liable for costs, etc., for the benefits it would have received if a single unit—that is, either a city or county—had brought the suit. Nor is there authority for transferring to the Clerk of the Pulaski Chancery Court the amount ultimately found to be due. Specifically, § 3 of Act 187 requires the Treasurer ". . . to apportion among the treasurers of counties and municipalities . . . all the moneys credited to the Cities and Counties Fund . . . immediately after July 1, October 1, January 1, and April 1 of each year."

The decree is reversed and the cause is remanded with directions to the lower court to proceed in a manner not inconsistent with this opinion.

FRANK G. SMITH, ROBINS and McFADDIN, JJ., dissent in part.

SMITH, J. (dissenting). The emergency clause attached to Act 187 of the Acts of 1943 was not adopted. This resulted from the fact that the majority vote for the act was sufficient to pass it, but was not sufficient to adopt the emergency clause. A majority vote suffices for the first purpose, while a two-thirds vote of all the members elected to each house of the General Assembly is required for the second. But the presence of the emergency clause is not without significance. It manifests the purpose and intent of its promoters to make the act effective at the earliest possible date, which intent was abortive, because the vote required for the adoption of the emergency clause was not secured.

We have, therefore, an act without an emergency clause, which, under the provisions of Amendment No. 7 to the Constitution, became effective 90 days after the

adjournment of the session of the General Assembly at which it was passed.

When did this act become effective? When does any act become effective? The answer would appear to be that it became effective when it became a law, and it is not questioned that the act became a law 90 days after the adjournment of the General Assembly which passed it, the date of adjournment being March 11, 1943.

At § 48 of the chapter on Statutes, 25 R. C. L., p. 799, appears this statement of the law: ''Provisions Postponing Time of Taking Effect. It is a principle self-evident, as well as declared in all the authorities on the subject, that statutory provisions go into immediate operation, unless by force of some general law, constitutional provision, or provision contained in the act itself, the operation is postponed to some future period or event; and the special provision which would create such postponement must be stated in express words to that effect, or in terms so clear and certain as to admit of no other rational interpretation.''

Stress is put on the fact in appellant's brief that Act 386 of the Acts of 1941, which Act 187 of the Acts of 1943 amends, became effective July 1, 1941, thereby making the fiscal year for the disbursement of funds (for raising which Act 386 provides) begin and end July 1st of each year.

Act 386 did become effective July 1, 1941; but this was true because § 21 of that act so expressly provided. And why was that provision inserted? The answer is, to prevent the act from being effective from and after its passage upon any date prior to July 1, 1941.

Now, Act 187 contains no such provision. It contains a contrary provision. Section 4 of Act 187, which immediately precedes what would have been the emergency clause, had it been adopted, provides that ''all laws and parts of laws in conflict herewith are hereby repealed and this act shall take effect and be in full force and effect from and after its passage.'' This section 4 became, and is, a part of the act, and is as effective as any other portion of it, although the emergency clause was

not adopted. It is true the absence of an emergency clause postponed the date on which the act would be effective for a period of 90 days after the adjournment of the session of the General Assembly which passed it; but there is nothing else which postponed its effective date beyond that time. It appears to us, who dissent from the majority opinion, that Act 187 has been in effect as a law since June 10, 1943, the date which marks the 90 day period after the adjournment of the 1943 session of the General Assembly.

If so, what then? The answer is, that after that date Act 386 should be read as though Act 187 had been a part of Act 386 when that act was passed. Southerland on Statutory Construction, § 237.

It is argued that this would change the fiscal year from the beginning which Act 386 provides, which date is July 1st. It may be answered that the General Assembly had the power to change the fiscal year, had it elected to do so, but it must first be said that Act 187 does not change the fiscal year.

What Act 187 does, and all it does, is to add another beneficiary to share in the distribution of the funds which Act 386 authorizes to be collected. It did not attempt to set up a new fiscal year, and it did not attempt to change the scheme of allotting funds on a fiscal year basis. Now, Act 187 will affect the apportionment of funds, which would otherwise have gone to other beneficiaries, but it does not affect funds collected before the act became a law. The cities, counties and towns of the state, the new and additional beneficiaries, seek to share only in the funds collected after the act became effective as a law. It is stipulated "that the sum of $700,600 was collected under Act 386 and turned over to the State Treasurer, during the 21 days of June, 1943," and it is in the distribution of this fund which it is stipulated was collected after the act became effective, in which the cities, counties and towns seek to share in the proportion provided by the act. There is another provision of Act 187 which should not be ignored, but which on the contrary is significant and, in our opinion, is of controlling

effect. In providing for the participation of cities, counties and towns in the distribution of this fund, the act recites that "The State Treasurer is hereby directed to create a fund to be known as the 'Cities and Counties Fund' and the remaining 5 per cent. thereof shall be paid into said fund until $400,000 is paid into said fund for each fiscal year *or part thereof*."

Now, in Act 187 the General Assembly set up a scheme of allocation to endure through the entire succeeding fiscal years, and certainly until the act might later be amended, and this provision for participation for a partial year could only have been intended to apply to the cities and counties fund. It was unnecessary for any provision to be made for the participation of the other beneficiaries for a part year, as provision had otherwise and previously been made for them, which was not on a partial year basis.

The cases of *Collins* v. *Humphrey*, 181 Ark. 609, 27 S. W. 2d 102, and *Cone* v. *Hope Imp. Dist.*, 169 Ark. 1032, 277 S. W. 544, are to the effect that there has been here no diversion of funds in violation of the constitution.

We concur in the view that it was error for the court to order the fund here in question to be paid to the clerk of the Pulaski chancery court for distribution by that official, but, for the reasons herein stated, we dissent from the holding that the cities, counties and towns do not have the right to share in the distribution of the funds turned over to the State Treasurer during the last 21 days of June.

I am authorized to say that Justice ROBINS and Justice McFADDIN concur in the views here expressed.

McFADDIN, J. (concurring in denying petition for rehearing on February 7, 1944).

In a splendid and exhaustive brief on rehearing the appellees have urged:

"(1) Distribution of the sales taxes to the cities and counties fund on the basis of receipts by the Commissioner of Revenues rather than on the basis of receipts by merchants making the sales is not an unlawful

diversion of taxes under Article 16, § 11 of the Constitution.

"(2) The court erred in holding that this was not a class suit out of which a reasonable attorney's fee could be allowed."

And under the second point above appellees have argued:

"A. This is a class suit.

"B. The allowances of attorney's fees is proper.

"C. The beneficiaries of the cities and counties fund are not exempted from paying a reasonable attorney's fee."

Over half of the brief is devoted to these last two points, being B and C, as above listed.

I still adhere to the views stated in the dissent by Mr. Justice FRANK SMITH and concurred in by Mr. Justice ROBINS and myself. But since so much emphasis in the rehearing brief has been placed on the question of the attorney's fee, I explain here why I think the court is correct in denying the petition for rehearing on this point.

Most of the cases cited by the appellees are cases where various parties have come into court and affirmatively sought relief and then have been held liable for attorney's fees. In the case at bar the only litigant which came into court was the city of Little Rock. The other cities in Arkansas, and all of the counties, never made any appearance in this case; so cases where parties came into court are not in point with the situation here. The question here is whether the counties of Arkansas and all the cities other than Little Rock should each be assessed attorney's fee in *absentia*.

Even if it be conceded that this is a class suit under § 1314 of Pope's Digest (which is not conceded), still the only attorney's fee that could be awarded in this case is the fee that the city of Little Rock paid to its counsel in this case; and there is no evidence that there was any fee agreed to be paid by the city of Little Rock.

Appellees cite and rely on the case of *Sprague* v. *Ticonic National Bank*, 307 U. S. 161, 83 Law Ed. 1184. That case, and the orders of the district court on remand (as found in 28 Fed. Sup. 229) illustrate thoroughly my views. There, Lottie F. Sprague employed attorneys and recovered approximately $5,000 for herself; and through her efforts and the application of the doctrine of *stare decisis*, fourteen trust funds likewise benefited. Against the funds created through her suit, Sprague sought to have taxed as costs the amount she had actually paid her attorneys. In other words, she sought *reimbursement* of her expenses from the trust funds that had benefited from her efforts. The United States Supreme Court spoke of it as "the petition for reimbursement" and allowed it as such; and on the remand the United States District Court (*Sprague* v. *Ticonic National Bank*, 28 Fed. S. 229) allowed Mrs. Sprague to prove that she had actually paid attorney's fees amounting to $1,214.51, and she was reimbursed to that amount. It is thus apparent that reimbursement for the amount actually paid out in attorney's fees is the basis for taxing attorney's fees as costs as in a class suit.

Applying this case from the United States Supreme Court to the case at bar would mean that the city of Little Rock could recover in this case only the attorney's fees that it has actually paid out in this case. But as I understand the brief filed herein, the attorneys are seeking a fee based on the entire recovery for all the cities and towns even though they never came into court. In my opinion, the case cited by the appellees does not sustain the contention here urged, which is far different from the theory of reimbursement.